IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION

Case No. 4:20-cr-81-M

| UNITED STATES OF AMERICA, | |
|---|---|
| Plaintiff, | |
| v. | ORDER |
| ANTHONY JOSEPH FRITZINGER, | |
| Defendant. | |

This matter comes before the court on Defendant's Motion to Suppress Evidence [DE 70]. Defendant argues that an early investigative interrogation violated his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966) and against compelled self-incrimination under the Fifth Amendment. Thus, his statements, including his cellphone password, and derivative evidence, including the contents of his cellphone, should be suppressed. Defendant also seeks an evidentiary hearing under *Franks v. Delaware*, 438 U.S. 154 (1978) to challenge the veracity of several subpoenas and a search warrant based on two purportedly reckless omissions from the related subpoena requests and warrant application.

For the following reasons, the court denies the suppression motion. It is not clear that *Miranda* applies because Defendant does not appear to have been "in custody" for purposes of the interrogation. Even if he had been in custody, however, relief under *Miranda* is unwarranted at this time. The United States has confirmed that it will not seek to introduce any interview statements into evidence. Moreover, Defendant knowingly and intelligently signed an advisement form and *Miranda* waiver. Thus, the admission of the fruits of his statements at trial would not

1

violate his constitutional right against self-incrimination. *See United States v. Oloyede*, 933 F.3d 302, 309–10 (4th Cir. 2019) (discussing *United States v. Patane*, 542 U.S. 630 (2004)).

The court also denies the request for an evidentiary hearing under *Franks*. The court dispenses with significant legal discussion regarding the veracity of the subpoena applications in this case and denies the request as frivolous. *See Franks*, 438 U.S. at 164–65 (supporting "challenge[s] to a warrant's veracity" and impact on probable cause determination); *In re Subpoena Duces Tecum*, 228 F.3d 341, 348–49 (4th Cir. 2000) (stating that subpoenas are judged "by the general reasonableness standard" and "not by the probable cause requirement"). Moreover, *Franks* does not entitle Defendant to relief to the extent he relies on the purported reckless omission of an incorrect legal conclusion. And to the extent he relies on the omission of his cellphone's review and extraction history to support his request, he fails to plausibly allege recklessness and materiality as to that purported omission. The court's reasoning follows.

I. **Background**

A. **Factual Background**

On April 21, 2020, Special Agent Peter Salomon ("S/A Salomon") of the Naval Criminal Investigative Service ("NCIS") learned that Defendant Anthony Fritzinger ("Fritzinger"), a Lance Corporal in the United States Marine Corps at that time, was dating minors online and exchanging sexually explicit photographs with them. *See* Affidavit, DE 70-7 at 3. S/A Salomon also learned that Fritzinger would attempt to extort the minors for additional photos by threatening to send their photographs to third parties unless they comply. *See id.* Based on this information, he started investigating Fritzinger for possessing child pornography, extortion, and solicitation of minors. *See id.* S/A Salomon then decided to interview Fritzinger.

According to Fritzinger, a staff sergeant ordered Fritzinger to ride in his personal vehicle to a location that the sergeant did not disclose. Upon arrival at said location, Fritzinger learned that

2

the staff sergeant had taken him to the building of NCIS. The staff sergeant escorted Fritzinger inside the building and delivered him into the custody of S/A Salomon. S/A Salomon ordered Fritzinger to empty his pockets and escorted him to the interviewing room. DE 70 at 2.

On April 27, 2020, Fritzinger arrived in the interview room around 2:10 p.m. S/A Salomon arrived a minute later. He immediately asked Fritzinger if he "needed a water or anything." He then introduced himself. Another agent also entered and introduced himself. *See* DE 70-1 at 00:23–01:58.

S/A Salomon explained his investigatory role and asked to gather biographical information. Fritzinger consented. 02:30–41.[1] Fritzinger added that he "didn't really get any sleep" because his roommate "screams at video games and blasts music all day." 02:42–47. S/A Salomon shared a similar experience and expressed his sympathy. S/A Salomon then asked some biographical questions and engaged in small talk with Fritzinger. 03:55–16:05.

At the end of the biographical portion of the interview, S/A Salomon presented a standard advisement and waiver form. *See* DE 70-2. As S/A Salomon read aloud each paragraph containing an explanation of Fritzinger's rights, Fritzinger confirmed his understanding by initialing beside each paragraph. When Fritzinger reviewed the right to the presence of appointed counsel during the interview, Fritzinger asked, "what if I don't have a lawyer right now?" He immediately re-read the form and realized one could be "appointed." 17:53–18:18. The last paragraph explained that Fritzinger could "terminate this interview at any time, for any reason." He initialed without the need for clarification. 18:21–27.

---

[1] All timestamps in this section of the order refer to specific portions of the Interview Footage [DE 70-1].

3

S/A Salomon then asked, "So understanding those rights as read to you, do you wish to speak to me today?" "I'm baffled by this whole situation," Fritzinger said. "And that's what I'm trying to figure out," S/A Salomon said, "but you have your rights, [and] you can talk to us and terminate at any time for any reason." Fritzinger asked, "Can I get a lawyer appointed to me right now, or . . . ?" S/A Salomon explained that Fritzinger could speak with the military legal department that same day, but the department probably would not "assign a lawyer" until charges were filed. Fritzinger added, "But chances are they wouldn't give me a lawyer." "No, no—I'm not saying they won't necessarily give you a lawyer," S/A Salomon replied. He reiterated Fritzinger could speak with a lawyer that same day but expressed that he did not know exactly how military counsel would be appointed. He also said the form fully explained Fritzinger's rights and NCIS was "just . . . trying to figure what's going on." 18:28–20:26.

Fritzinger asked, "When I terminate [the interview], will we be able to continue [it] after I get a lawyer?" S/A Salomon said they could. Fritzinger then stated, "I at least want to know what, what, how—how I'm getting charged with, or not charged but *suspected of*, something." In response, S/A Salomon indicated he needed information from Fritzinger before he could provide Fritzinger with any information pertaining to the investigation. "I think what I'll do is I want to at least hear you out before I call a lawyer," Fritzinger replied. Fritzinger reviewed the entire advisement form again, confirmed that he "freely and voluntarily" decided to speak with S/A Salomon at that time, and signed the form without the need for further clarification. 20:33–23:14.

S/A Salomon then probed Fritzinger regarding his feelings on and experience with child pornography. In total, Fritzinger denied possessing or soliciting child pornography but acknowledged communicating with his girlfriends via online accounts. 23:28–41:38. During a conversation about how Fritzinger saved cellphone data, S/A Salomon asked for Fritzinger's

4

cellphone passcode. Fritzinger obliged without hesitation. 41:28–32. Fritzinger then stated, "I feel like this is probably the point in time where I'm supposed to do that," and clarified "*lawyer*." 41:51–42:59. S/A Salomon concluded the interview and seized the cellphone for later review.

The next day, S/A Salomon attempted to extract the cellphone's contents. The extraction failed for technical reasons, so S/A Salomon manually reviewed the device and found "hardly any content." DE 70-3. He then sent the cellphone to a specialist for a comprehensive forensic review. *See id.* Based on a "review of the cellphone" and "contact with victims," S/A Salomon identified various email addresses and social media accounts that he believed Fritzinger had used for his "extortion scheme." *See* DE 70-4 at 5; DE 70-5 at 2; DE 70-6 at 3, 70-8 at 2.

On June 17, 2020, S/A Salomon requested a search warrant targeting seventeen Instagram usernames for evidence of child pornography possession, extortion, and solicitation of minors. *See* DE 70-7 at 3. His supporting affidavit explained that he identified the targeted usernames after reviewing the contents of Fritzinger's cellphone and the information provided by the referring police department. *Id.* at 5.[2] Based on the content associated with the usernames and the fact that Fritzinger's cellphone had access to these usernames, S/A Salomon stated that he believed the usernames belonged to Fritzinger. *Id.* S/A Salomon then explained that Fritzinger had used similar usernames to solicit child pornography from several victims. *Id.* at 3–6. He also explained why the electronic "information stored in connection with an Instagram account may provide crucial evidence . . . of the criminal conduct under investigation." *Id.* at 6–10.

---

[2] The United States submitted an exhibit showing that reviewing the cellphone's contents allowed Agent Salomon to identify twelve additional usernames that he would not have otherwise identified based on the referring police department's information. *See* DE 74-1.

## B. Procedural Background

On September 2, 2020, the United States indicted Fritzinger on one count of manufacturing child pornography, in violation of 18 U.S.C. § 2251(a) & (e); one count of possession of such material, in violation of 18 U.S.C. § 2252(a)(4)(B); and two counts of using the internet to promote an extortion scheme, in violation of 18 U.S.C. § 1952(a)(3). *See* DE 1. The United States has since superseded those charges. DE 84 (second superseding indictment). In addition to the original counts, Fritzinger now faces four counts of enticing a minor to engage in illegal sexual conduct, in violation of 18 U.S.C. § 2422(b) and four additional counts of manufacturing child pornography. *See* DE 84. Trial is currently scheduled to begin on September 9, 2024.

On January 22, 2024, Fritzinger filed the instant motion to suppress and for a *Franks* hearing. DE 70. The United States responded on February 12, 2024. DE 74. Fritzinger timely replied. DE 78. The court has determined that an evidentiary hearing in connection with this motion is unnecessary because the parties do not genuinely dispute any of the material facts related to the issues at bar. *United States v. Griffin*, 811 F. App'x 815, 816 (4th Cir. 2020). The motion is therefore ripe for disposition.

## II. Legal Standards

### A. Right Against Compelled Self-Incrimination

The Fifth Amendment provides that no person "shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. A violation occurs when "the accused is [1] compelled [2] to make a testimonial communication [3] that is incriminating." *United States v. Sweets*, 526 F.3d 122, 127 (4th Cir. 2007) (quoting *Fisher v. United States*, 425 U.S. 391, 408 (1976)). To safeguard this constitutional guarantee in the context of custodial interrogations, law enforcement officers are generally required to provide specific warnings to the defendant before questioning, including that "[the defendant] has a right to remain silent, that any statement he does

make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). "The *Miranda* rule creates a presumption of coercion, in the absence of specific warnings, that is generally irrebuttable for purposes of the prosecution's case in chief." *United States v. Patane*, 542 U.S. 630, 639 (2004) (plurality). "The exclusion of unwarned statements is a complete and sufficient remedy for any perceived *Miranda* violation." *See id.* (cleaned up).

However, a *Miranda* violation does not require suppression of "nontestimonial evidence obtained as a result of voluntary statements." *Id.* at 637; *id.* at 644–45 (Kennedy, J., concurring) (agreeing with the plurality that "evidence obtained following an unwarned interrogation" is admissible). In *Patane*, officers failed to provide a *Miranda* warning to a suspect before asking him the location of his firearm, which he disclosed. *See id.* at 635. The plurality opinion in *Patane* held that the firearm was admissible. *Id.* at 636. It reasoned, although the defendant's statement was unwarned, "the *Miranda* rule is a prophylactic employed to protect against violations of the Self-Incrimination Clause." *See id.* at 636, 643. But the "admission of such fruit presents no risk that a defendant's coerced statements (however defined) will be used against him at a criminal trial." *See id.* Thus, the Self-Incrimination Clause "is not implicated by the admission into evidence of the physical fruit of a voluntary statement." *Id.* Thus, pursuant to *Patane*, the Fourth Circuit has held that, to the extent that unlocking a cellphone in response to an officer's request was communicative in nature, "the fruit of that voluntary communication, even though made without a *Miranda* warning, would nonetheless be admissible into evidence." *United States v. Oloyede*, 933 F.3d 302, 309 (4th Cir. 2019).

To determine whether a statement was voluntary, the court must ask "whether the defendant's will has been overborne or his capacity for self-determination critically impaired"

7

through coercive police activity. *United States v. Umana*, 750 F.3d 320, 344 (4th Cir. 2014) (quoting *United States v. Braxton*, 112 F.3d 777, 780 (4th Cir. 1997) (en banc)). The court must consider "the totality of the circumstances, including the characteristics of the defendant, the setting of the interview, and the details of the interrogation." *Id.* (quoting *United States v. Pelton*, 835 F.2d 1067, 1071 (4th Cir. 1987)). "The mere existence of threats, violence, implied promises, improper influence, or other coercive police activity . . . does not automatically render a confession involuntary." *Braxton*, 112 F.3d at 780. "Any interview of one suspected of a crime by a police officer will have coercive aspects to it," but "the statements made may [nonetheless] be voluntary." *United States v. Leggette*, 2020 WL 6275802, at *7 (M.D.N.C. Oct. 26, 2020), *aff'd*, 57 F.4th 406 (4th Cir. 2023) (cleaned up) (quoting *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977) (custodial statements were voluntary based on "the nature and circumstances of the interrogation"). "The Government bears the burden of proving by a preponderance of the evidence that the statement was voluntary." *Braxton*, 112 F.3d at 781.

## B. *Franks* Hearing

"'A *Franks* hearing provides a criminal defendant with a narrow way to attack the validity' of a search-warrant affidavit." *United States v. Haas*, 986 F.3d 467, 474 (4th Cir. 2021) (quoting *United States v. Moody*, 931 F.3d 366, 370 (4th Cir. 2019)). "Along with affirmative false statements, '*Franks* protects against omissions that are designed to mislead, or that are made in reckless disregard of whether they would mislead, the magistrate'" or issuing judicial officer. *Id.* (quoting *United States v. Colkley*, 899 F.2d 297, 301 (4th Cir. 1990)).

"To obtain a *Franks* hearing, a defendant must make a 'substantial preliminary showing' to overcome the 'presumption of validity with respect to the affidavit supporting the search warrant.'" *Id.* (quoting *Moody*, 931 F.3d at 370). When a defendant relies on a theory of reckless omission, the defendant must show that law enforcement made (1) an omission (2) with reckless

8

disregard for the truth and (3) had the omitted evidence been included in the affidavit, it would have defeated probable cause. *See id.* If the defendant is successful, he is entitled to a hearing "to develop evidence on the affidavit's veracity." *Id.* at 474.

To demonstrate reckless disregard in the *Franks* context, the defendant must show that "the affiant personally recognized the risk of making the affidavit misleading." *United States v. Pulley*, 987 F.3d 370, 377 (4th Cir. 2021). "Reckless disregard is a subjective inquiry; it is not negligence nor even gross negligence." *Id.* The "affiant must have been subjectively aware that the false statement or omission would create a risk of misleading the reviewing magistrate judge and nevertheless chose to run that risk." *Id.*

As for materiality, the familiar standards of probable cause apply. Reviewing courts generally give "great deference" to the issuing judicial officer's finding of probable cause and ask whether a "substantial basis" existed for the previous probable cause finding. *United States v. Blakeney*, 949 F.3d 851, 859 (4th Cir. 2020) (citation omitted). "When issuing a warrant and making a probable cause determination, judges are to use a 'totality of the circumstances analysis.'" *United States v. Grossman*, 400 F.3d 212, 217 (4th Cir. 2005) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). The judge must determine, under the totality of the circumstances, whether "there is a 'fair probability that contraband or evidence of a crime will be found in a particular place.'" *United States v. Richardson*, 607 F.3d 357, 369 (4th Cir. 2010) (quoting *Gates*, 462 U.S. at 238).

Courts require a certain level of rigor when faced with *Franks* challenges. The defendant's "showing 'must be more than conclusory' and must be accompanied by a detailed offer of proof." *Colkley*, 899 F.2d at 300 (quoting *Franks*, 438 U.S. at 171 (1978)). "Allegations should be accompanied by a statement of supporting reasons, and affidavits or sworn or otherwise reliable

statements of witnesses should be furnished, or their absence satisfactorily explained." *United States v. Pettiford*, 337 F. App'x 352, 354 (4th Cir. 2009); *United States v. Chandia,* 514 F.3d 365, 373 (4th Cir. 2008) ("Because [the defendant] did not make the required offer of proof in support of his allegations of misconduct, the district court did not err in omitting a *Franks* hearing.").

### III. Discussion

#### A. Voluntariness of Statements

Fritzinger moves to suppress "all evidence and testimony discovered pursuant to the illegal interrogation conducted on April 27, 2020." DE 70 at 1. He first argues that his interview statements should be suppressed because the interview violated his *Miranda* rights. *See* DE 70 at 5–10. However, it is unclear whether *Miranda* applies at all because Fritzinger does not appear to be "in custody." Indeed, S/A Salomon instructed Fritzinger numerous times that Fritzinger could leave the interview "at any time, for any reason." DE 70-1 at 16:19–18:29, 21:24–23:22; *see also* DE 70-2. A reasonable person in Fritzinger's circumstances would have understood that he could have left at any time by invoking his right to terminate and/or obtain counsel, rather than believing that his "freedom of action [was] curtailed to a degree associated with formal arrest." *See, e.g.*, *United States v. Hargrove*, 625 F.3d 170, 179 (4th Cir. 2010) (cleaned up) (finding no custody, in part, where defendant was not handcuffed during interview, agents did not draw their weapons, and the conversation was non-threatening); *United States v. Nguyen*, 313 F. Supp. 2d 579, 588 (E.D. Va. 2004) (finding no custody where defendant "came to the station voluntarily with" the escort of an officer and "was free to end the interview and leave the station at any time").

The United States does not argue this issue. The court thus assumes without deciding that Fritzinger was "in custody" at the time of the interview and that the interview violated his *Miranda* rights. However, even in this posture, Fritzinger would not be entitled to relief under *Miranda*. As stated above, the "exclusion of unwarned statements is a complete and sufficient remedy." *See*

10

*Patane*, 542 U.S. at 639. The United States has confirmed that it does not intend to introduce any of Fritzinger's interview statements into evidence at trial. *See* DE 74 at 6 n.3. Based on the United States's stated intentions, the court need not decide whether the interview violated Fritzinger's *Miranda* rights. Even if there were a violation, it would not matter.

The parties, however, vigorously dispute whether the fruits of Fritzinger's statements, specifically the contents of his cellphone, should be suppressed. *See* DE 74 at 6; DE 78 at 3. The contents of his cellphone were derived from his statement at the end of the interview providing his passcode. To determine whether the cellphone's contents should be suppressed, the court must decide whether Fritzinger's statement was voluntary. *See Oloyede*, 933 F.3d at 309–10.

Fritzinger argues that the statement providing his passcode was involuntary for several reasons. S/A Salomon incorrectly advised him regarding his right to counsel. He continued questioning Fritzinger after Fritzinger properly invoked that right. And he used other "psychologically coercive techniques," like exploiting Fritzinger's "sleep-deprived" mental state to obtain the contents of the cellphone. *See* DE 70 at 10–17; DE 78 at 3–4.

The United States argues that the statement was voluntary. *See* DE 74 at 7. According to the United States, S/A Salomon did not mislead Fritzinger regarding his right to counsel. He did not disregard Fritzinger's request for counsel or exploit Fritzinger's apparent lack of sleep. Nor did he use any other coercive interrogation techniques. *See id.* at 8–14. Rather, the total circumstances demonstrates that he provided his passcode voluntarily. *See id.* at 14–15.

The court must look to the totality of the circumstances to determine "whether the defendant's will has been overborne or his capacity for self-determination critically impaired" by coercive police activity. *See Umana*, 750 F.3d at 344 (citation omitted). The fact that the statement at issue occurred during a station house interview with two NCIS officers present weighs against

11

voluntariness. *See Mathiason*, 429 U.S. at 495 ("Any interview of one suspected of a crime by a police officer will have coercive aspects to it . . . ."). However, despite the interview's setting, the statement at issue was nonetheless voluntary based on the total circumstances.

At the beginning of the interview and before providing his passcode, Fritzinger thoroughly reviewed a written advisement form indicating that he had the right to the presence of counsel and that he could "terminate this interview at any time, for any reason." *See* DE 70-1 at 16:19–18:29, 21:24–23:22; *see also* DE 70-2. Although he asked whether he could obtain a lawyer "right now," the context of his question shows he was attempting to clarify the scope of his right to the presence of counsel. DE 70-1 at 20:33–21:24. This inference is bolstered by his subsequent questions clarifying whether he could resume the interview after obtaining counsel. *Id.* He then confirmed he did in fact "wish to speak to [S/A Salomon]" at that time, clarifying that "[he] want[ed] to at least hear [the agent] out before [he] call[ed] a lawyer." *See id.* at 21:25–38. He signed the waiver, which also indicated he understood his rights and made the decision to speak with S/A Salomon "freely and voluntarily." *See id.* at 22:13–23:13; DE 70-2. These facts demonstrate that Fritzinger wanted to speak with S/A Salomon at that time. *Cf. United States v. Nguyen*, 313 F. Supp. 2d 579, 588 (E.D. Va. 2004) ("In sum, because there is no doubt that [the] waiver and statement were knowing, intelligent, and voluntary, the statement must not be suppressed.").

Fritzinger ultimately did change his mind after he signed the *Miranda* waiver. After making statements and asking questions and *after* he provided his passcode, he stated that he wanted to terminate the interview and seek counsel. DE 70-1 at 41:39–43:30 ("I feel like this is probably the point in time where I'm supposed to [obtain a lawyer]."). This statement demonstrates that he understood his rights from the outset of the interview and was willing to speak to S/A Salomon

12

until invoking his right to terminate the interview and seek counsel. Fritzinger's decision to provide S/A Salomon his cellphone passcode was voluntary.

Fritzinger articulates three reasons why the court should conclude he provided his passcode involuntarily. DE 70 at 10–17. However, none of them establish that his will was overborne by coercive police misconduct.

Fritzinger first argues that S/A Salomon misled him into believing that he could not obtain appointed counsel before participating in questioning. *See* DE 70 at 11–12, 14. He submits S/A Salomon "incorrectly told [him] that he could not be appointed counsel until he was formally charged." *Id.* at 11. But in truth he "had the right to consulted [sic] with the military justice defense" before adjudicative proceedings commenced. *Id.* Fritzinger maintains, if "[Agent] Salomon had properly informed him" regarding whether he could obtain a lawyer at that time, he "may have made further statements requesting [a lawyer]." *Id.* at 14.

This argument is unconvincing for several reasons. First, S/A Salomon did not materially mislead Fritzinger regarding his right to appointed counsel. Rather, S/A Salomon correctly advised that Fritzinger would be able to terminate the interview and speak with a lawyer that same day before proceeding with questioning. *See Braxton*, 112 F.3d at 782 (truthful statements are not coercive). Second, Fritzinger demonstrated at multiple times, verbally and in writing, that he understood his right to obtain counsel before participating in the interview. For example, he affirmatively expressed his desire to terminate the interview and obtain a lawyer after he provided his passcode. He would not have invoked the right to terminate the session and obtain counsel if he did not understand that right from the outset. Thus, even if the advisement was somehow misleading, that effect was not overbearing or critically impairing.

13

Fritzinger maintains he properly invoked his right to counsel by asking "Can I get a lawyer appointed to me right now, or . . . ," DE 70-1 at 18:28–20:26, but S/A Salomon "did not stop questioning [him]." DE 70 at 12–15 ("Salomon violated Fritzinger's right to counsel by questioning him after invoking his that right. . . [T]he resulting statements were involuntary . . . ."). However, in context, his question was about the appointment process and not "an unequivocal request for counsel." *See Burket v. Angelone*, 208 F.3d 172, 198 (4th Cir. 2000). Therefore, the issue here is not whether Fritzinger was entitled to cessation after properly invoking his right to counsel. He did not properly invoke, and he waived his *Miranda* rights.

A separate question arises regarding the voluntariness of his statement. *See Oloyede*, 933 F.3d at 309. The record demonstrates that Fritzinger stated he understood his right to counsel, confirmed he wanted to speak with S/A Salomon, and answered S/A Salomon's questions without the need for further clarification or exhibiting hesitation. He later invoked his right to counsel to end the interview. His post-warning statements and later invocation of the right to counsel belie the notion that he desired to terminate the interview when he asked about the appointment process. In short, he was not coerced to keep speaking. He voluntarily elected to answer the questions, and as a result of his decision, to provide his passcode.

Fritzinger also charges S/A Salomon with using a variety of other "psychologically coercive techniques" which ultimately compelled him to speak. *See id.* at 10–17. For example, S/A Salomon "downplayed the severity of the accusation" by stating that he "'just' wanted to figure out the information" pertaining to his investigation. *See id.* at 16; DE 70-1 at 16:29–39. S/A Salomon also knew Fritzinger lacked sleep but still allowed the interview to occur. *See* DE 70 at 16. Lastly, S/A Salomon indicated he could not provide information on the investigation until Fritzinger participated in questioning. *See id.* at 16–17.

14

However, the evidence discussed above demonstrates that before Fritzinger provided his passcode he expressed a desire to cooperate with S/A Salomon so he could learn about the investigation. That does not show a free will "overborne" by S/A Salomon's actions. *See Umana*, 750 F.3d at 344.

Even if Fritzinger wanted to resist questioning, none of the "psychologically coercive techniques" were sufficient to render the statement involuntary. Indeed, downplaying the situation was akin to "cryptic encouragement." *See id.* at 344. Moreover, Fritzinger alleges that he arrived sleep-deprived, so S/A Salomon did not "deprive [him] of anything." *Braxton*, 112 F.3d at 784. There is also nothing in his brief or the record evidence to suggest that he was so sleep-deprived that he was physically incapable of making a voluntary, knowing, and intelligent waiver. And S/A Salomon "had no duty to advise [Fritzinger] of the identity of the specific offense[s] under investigation." *Id.*; *see also Colorado v. Spring*, 479 U.S. 564, 577 (1987) (holding that in a custodial interrogation setting "a suspect's awareness of all the possible subjects of questioning in advance of interrogation is *not relevant* to determining whether the suspect voluntarily, knowingly, and intelligently waived his Fifth Amendment privilege" (emphasis added)).

Here, although Fritzinger met two officers for a station house interview, the officers were courteous and calm. So was Fritzinger. After an adequate advisement of his rights and probing questions by Fritzinger regarding the outer limits of those rights, Fritzinger knowingly and intelligently waived his *Miranda* rights because "[he] want[ed] to at least hear [the agent] out before [he] call[ed] a lawyer." DE 70-1 at 21:25–38. He calmly answered additional questions and provided his passcode without hesitation. He was not subjected to any "threats, violence, implied promises, improper influence, or other coercive police activity." *Braxton*, 112 F.3d at 780. Because

15

he provided his passcode voluntarily, his arguments provide no basis to suppress the contents of his cellphone.

## B. Recklessness and Materiality of Omissions under *Franks*

Fritzinger relies on *Franks* to challenge the validity of "the search warrants and subpoenas" subsequent to the April 27, 2020 interview. *See* DE 70 at 1, 24. In particular, his claim implicates four subpoenas pertaining to various email and social media accounts [DE 70-4, 70-5, 70-6, 70-8] and a search warrant targeting seventeen Instagram usernames for evidence of child pornography possession, extortion, and solicitation of minors [DE 70-7].

As discussed above, *Franks* itself cannot provide relief regarding the allegedly deficient subpoenas in this case. *See In re Subpoena Duces Tecum*, 228 F.3d 341, 348 (4th Cir. 2000). However, *Franks* may entitle Fritzinger to an evidentiary hearing to challenge the allegedly misleading affidavit supporting the Instagram search warrant, provided that Fritzinger can substantially demonstrate a valid claim to relief.

Fritzinger identifies two omissions in S/A Salomon's supporting affidavit. The first alleged omission is "the passcode was obtained through an illegal interrogation." DE 70 at 18–19. The United States argues this omission cannot support a *Franks* claim because it reframes "very debatable" arguments concerning the legality of the interrogation as "facts" that S/A Salomon knew but recklessly omitted from his affidavit. *See* DE 74 at 17. The court agrees.

*Franks* concerns omissions of fact, not legal conclusions. *See Franks*, 438 U.S. at 165 (explaining that "a challenge to a warrant's veracity must be permitted" because "the Fourth Amendment demands a factual showing" (citation omitted)); *see also Pulley*, 987 F.3d at 376 (explaining that *Franks* challenges are available "when the affiant has omitted material facts from the affidavit"). Moreover, the purported omission on which he relies, that "the passcode was

16

obtained through an illegal interview," is wrong and does not constitute an omission. As the court discussed above, Fritzinger voluntarily provided his passcode.

Fritzinger identifies a second omission to support his *Franks* claim. S/A Salomon purportedly omitted "that the phone was manually reviewed, revealing nothing relevant, and [then] forensically extracted on three different occasions." *See* DE 70 at 18–19. He argues that "the importance of this omission amounts to at least reckless disregard" because it affected "the reliability of the basis for probable cause [i.e., the cellphone]." *See id.* at 21.[3] Fritzinger contends that this omission was also material to the probable cause determination because the contents of his cellphone provided the necessary link to the targeted Instagram usernames. *See id.* at 21–23.

---

[3] For completeness, the following provides Fritzinger's full-length argument explaining why the purported omission was made with reckless disregard:

> The magistrate did not have pertinent information regarding the circumstances of the phone search. Similar factors here point to this conclusion: (1) manual review of the phone commenced only after a first formal extraction failed, (2) Salomon's participation in the search, (3) the affidavit's creation within days of the search, and (4) the impact of the coercive interview and minimal findings on the phone as to the likelihood of finding further information with the search warrant. Therefore, the magistrate could not properly determine probable cause.
>
> Salomon's omission was intended to mislead the magistrate, so it was made intentionally. Unlike *Colkley*, where information that neither tended to suggest nor disprove probable cause was excluded, the omission regarding Fritzinger's cell phone affected the reliability of the basis for probable cause. This Court should not rule as in *Colkley* because the importance of this omission amounts to at least reckless disregard. Though Salomon was not required to include every possible piece of information in his affidavits, he intentionally excluded information regarding the basis of the search warrant—the cell phone.

DE 70 at 19–21. Fritzinger's argument is somewhat circular. However, the court ascertains his main point to be that the extraction/review history omission was made recklessly because the omitted information was important to determine probable cause, as it would cast doubt on the "reliability" of the cellphone's contents as competent evidence. *See supra.*

17

Fritzinger fails to sufficiently allege recklessness. He fails to provide "a detailed offer of proof" to show that S/A Salomon personally appreciated the risk that the omission would mislead the issuing military judge and decided to ignore that risk. *See Colkley*, 899 F.2d at 300; *Pulley*, 987 F.3d at 377. Moreover, he relies on S/A Salomon's purported failure to recognize the objective importance of the omitted information to demonstrate a culpable mental state. Despite framing this purported failure as amounting to reckless disregard, Fritzinger essentially presents a theory of negligence to support his *Franks* challenge. "Allegations of negligence or innocent mistake are insufficient" to warrant an evidentiary hearing. *See Franks*, 438 U.S. at 171.

Fritzinger also fails to demonstrate materiality. Even if S/A Salomon had stated in his supporting affidavit that the cellphone had been extracted several times and that manual review was unsuccessful, S/A Salomon indicated that he obtained and reviewed the contents of the cellphone at some point prior to his warrant application. *See* DE 70-7 at 5. Additionally, his review of the cellphone's contents, coupled with his review of the information provided by the police department previously investigating Fritzinger, allowed him to identify the targeted usernames. *Id.* Once he identified the usernames, he reviewed the content associated with them. *Id.* He stated that he believed the usernames belonged to Fritzinger because of the nature of the content and the fact that he found them on Fritzinger's phone. *See id.* These facts provide a "substantial basis" to believe the targeted usernames belonged to Fritzinger for his alleged criminal use. *See Blakeney*, 949 F.3d at 859. In short, had the cellphone's extraction and review history been stated in greater detail, the usernames would have remained a proper target of a warrant in light of the other information provided to the issuing military judge.

18

## IV. Conclusion

For the foregoing reasons, Defendant's Motion to Suppress Evidence [DE 70] is DENIED. The contents of Defendant's cellphone shall not be suppressed. An evidentiary hearing regarding the truth of the investigatory subpoenas and Instagram search warrant is unwarranted.

SO ORDERED this 6th day of June, 2024.

*Richard E Myers II*
RICHARD E. MYERS II
CHIEF UNITED STATES DISTRICT JUDGE